**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 210397-U

Order filed June 30, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| In re P.J., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| a Minor, | ) | Peoria County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee | ) | |
| | ) | Appeal No. 3-21-0397 |
| v. | ) | Circuit No. 14-JA-317 (cons. w/ |
| | ) | 21-P-81) |
| April L.J. and Jacob R., | ) | |
| | ) | |
| Respondents | ) | |
| | ) | |
| and Katheline F., | ) | Honorable |
| | ) | Timothy J. Cusack, |
| Intervenor-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE HAUPTMAN delivered the judgment of the court.
Justices Daugherity and Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   In consolidated proceedings involving a minor, the circuit court erred by denying former foster parent's petition to intervene, where she was not given notice or an opportunity to be heard on a petition for guardianship filed by paternal grandparents and her intervention was in the minor's best interest.

¶ 2    Katheline F., as the former foster parent of P.J., filed a petition to intervene in Peoria County consolidated case Nos. 14-JA-317 and 21-P-81, wherein Katheline intended to file a

motion to vacate the guardianship established for P.J. with her paternal grandparents, Terry and Kathy Davis. The circuit court denied Katheline's petition to intervene. Katheline appeals.

¶ 3                                    I. BACKGROUND

¶ 4         This appeal arises from the denial of Katheline's petition to intervene in Peoria County consolidated case Nos. 14-JA-317 and 21-P-81, which related to P.J. In the sections contained immediately below, we articulate the circumstances relevant to that decision by the circuit court.

¶ 5              A. Proceedings Under the Juvenile Court Act of 1987

¶ 6         On December 15, 2014, P.J. and her half-sibling were placed in the care of a licensed relative foster parent, Katheline. The next day, on December 16, 2014, the Illinois Department of Children and Family Services (DCFS) filed a petition for the adjudication of wardship in Peoria County case No. 14-JA-317 under section 2-3 of the Juvenile Court Act of 1987 (Act). 705 ILCS 405/2-3 (West 2014). DCFS alleged P.J. was neglected due to an injurious environment created by her mother, April L.J., and presumed father, Charles G. At a subsequent shelter care hearing on December 17, 2014, DCFS was granted temporary custody of P.J. with the right of placement.

¶ 7         On February 19, 2015, the circuit court found Jacob R., not Charles, was P.J.'s father. Jacob was a federal inmate due to five convictions for the possession or manufacture of methamphetamine. Charles is P.J.'s half-sibling's father. Katheline is Charles's mother and P.J.'s half-sibling's paternal grandmother. This resulted in P.J.'s case, Peoria County case No. 14-JA-317, sometimes being heard with her half-sibling's case, Peoria County case No. 14-JA-318.

¶ 8         On March 12, 2015, P.J. was adjudicated neglected. In an order listing both Peoria County case Nos. 14-JA-317 and 14-JA-318, the circuit court found April was unfit. Jacob was also found unfit due to his long criminal history and current incarceration. Charles was fit and

2

did not contribute to P.J.'s injurious environment, but the circuit court found it was necessary to place P.J's half-sibling outside of the home. Both children remained in Katheline's foster care.

¶ 9 Over the next several years, the circuit court considered the fitness of April, Charles, and Jacob. April remained unfit, resulting in the termination of her parental rights. Charles, initially, was only found to be unwilling to make reasonable efforts. This resulted in a finding that Charles's visits had to be supervised by DCFS. Charles could not "visit[] at foster parent's home or foster parent risk[ed] removal of minors from the foster parent." Due to his continued unwillingness, Charles was found to be unfit pursuant to a motion filed by the State.[1] At the time of that unfitness finding, the circuit court reiterated, "visits [by Charles] are to be supervised by Family Care and grandmother/foster mother is not to permit any contact of any sort by either of the minors with any parent other than through the Family Care." In subsequent proceedings held after Charles was found to be unfit, Katheline was named P.J.'s half-sibling's adoptive mother.

¶ 10 Jacob also remained unfit due to his incarceration. The State twice attempted to terminate his parental rights, alleging he failed "to make reasonable progress toward the return of *** [P.J.] during any 9 month period" after the adjudication of neglect and was "a depraved person" due to his drug-related convictions. The State's first attempt resulted in our court reversing the decision to terminate Jacob's parental rights. See *In re P.J.*, 2018 IL App (3d) 170539. The State's second attempt resulted in a finding that the termination of Jacob's parental rights was not in P.J.'s best interest. The circuit court ordered DCFS to remain P.J.'s guardian with the right of placement.

¶ 11 B. Incidents During Katheline's Foster Care

¶ 12 During the circuit court proceedings, P.J. was removed from Katheline's foster care, on three separate occasions, after alleged incidents of unsupervised contact between Charles and

---

[1]Although Jacob is P.J.'s father, the motion was filed in Peoria County case No. 14-JA-317.

P.J. Such contact allegedly violated the circuit court's orders. The first removal occurred on October 5, 2016, after Charles was pulled over for a traffic violation. P.J. and her half-sibling were in the vehicle. Charles was arrested by the police for outstanding warrants. P.J. and her half-sibling were returned to Katheline after she filed and won an administrative appeal of the removal decision. The administrative law judge found, by a preponderance of the evidence, the decision to remove the children was improper. Specifically, the removal of the children from Katheline was inappropriate due to their needs regarding safety, well-being, and permanency.

¶ 13     The second removal occurred on January 3, 2019, after U.S. Marshals appeared at Katheline's home, while a DCFS licensing worker was present, to secure Charles, who had apparently been hiding on the second floor of Katheline's home. Charles was apprehended by the marshals after he jumped from a second-floor window. The circuit court noted Katheline was unable to explain Charles's presence in her home. An initial DCFS investigation of this incident resulted in a conclusion of "unfounded." However, after an administrative appeal by P.J.'s guardian *ad litem*, the conclusion was changed to "indicated" for inadequate supervision. Katheline's administrative appeal of that conclusion was pending when the circuit court entered a removal order. Katheline later succeeded in the administrative appeal, resulting in a conclusion that the second incident was "unfounded."

¶ 14     The third removal occurred on February 3, 2021. The circuit court stated, DCFS "reports *** [P.J.'s] guardian[, Katheline,] allowed *** [Charles] to stay at their home and that there are concerns with *** [P.J.'s] living situation."[2] Thus, DCFS was afforded the discretion to remove P.J. from Katheline's foster care. Shortly thereafter, the circuit court clarified that DCFS had the discretion to make decisions in the best interest of P.J. On May 10, 2021, the incident resulting in

---

[2]The parties acknowledge the record does not provide much information about this third incident.

4

the removal of P.J. from Katheline's foster care was deemed "unfounded." DCFS determined "no credible evidence of child abuse or neglect was found during th[e] investigation." However, DCFS noted "[t]his does not necessarily mean that an incident did not occur[,] [as] [a]n incident may have occurred but the evidence did not rise to the level required to indicate for abuse or neglect as dictated by state law and DCFS Administrative Rule."

¶ 15    C. Paternal Grandparents' Petition for Guardianship and Katheline's Petition to Intervene

¶ 16    On February 26, 2021, paternal grandparents filed a petition for guardianship of P.J., which initiated Peoria County case No. 14-P-81. Paternal grandparents were previously allowed to intervene, by agreement of the parties, in Peoria County case No. 14-JA-317. Paternal grandparents noted that April and Jacob were presently unable or unwilling to care for P.J.

¶ 17    On March 2, 2021, paternal grandparents filed a motion to consolidate Peoria County case Nos. 14-JA-317 and 21-P-81. The circuit court granted that motion on March 5, 2021.

¶ 18    On April 13, 2021, Jacob filed an appearance and consent to the appointment of paternal grandparents as P.J.'s guardians. Jacob waived notice of future hearings. That same day, the circuit court entered an order appointing paternal grandparents as P.J.'s guardians. The circuit court also entered a case closure order, listing only Peoria County case No. 14-JA-317, stating:

> "The Court reserves finding of fitness of *** [Jacob] and retains
> jurisdiction for future fitness findings. [Jacob] *** remains UNFIT. The Court
> finds that Permanency has been achieved through permanency. The Court
> terminates wardship, appoints PATERNAL GRANDPARENTS *** as the
> Guardians of the Minor, and removes DCFS as Guardian of the Minor. Case
> closed." (Emphasis in original omitted.)

5

¶ 19        On May 11, 2021, which was the day after the third incident resulting in P.J.'s removal from Katheline's foster care was determined to be "unfounded," Katheline filed a petition to intervene in the consolidated proceedings under section 1-5(2)(c) and (d) of the Act (705 ILCS 405/1-5(2)(c), (d) (West 2020)) and section 2-408(a)(2) and (b) of the Code of Civil Procedure (735 ILCS 5/2-408(a)(2), (b) (West 2020)).[3] Katheline stated she was P.J.'s foster parent for approximately six years before P.J. was removed from her care on February 3, 2021. Katheline argued there was no final determination that the circumstances of P.J.'s placement "would jeopardize *** [P.J.'s] health or safety or present an imminent risk of harm" to her life. Yet, P.J.'s placement in her care was "effectively permanently terminated" due to the guardianship of paternal grandparents and the termination of P.J.'s wardship. Katheline indicated she received no notice of a changed permanency goal for P.J. or the decision to terminate P.J.'s wardship. Since P.J. was essentially raised by Katheline and P.J.'s half-sibling remained in her care, Katheline argued it was in P.J.'s best interest for the circuit court to grant her petition to intervene. Attached to the petition to intervene was a motion to vacate paternal grandparents' guardianship, which Katheline sought to file after intervening.

¶ 20        Paternal grandparents filed a response to Katheline's petition to intervene on June 24, 2021. That same day, paternal grandparents also filed a motion to strike the petition to intervene. Paternal grandparents noted P.J. was temporarily removed from Katheline's care three times due to alleged unpermitted contact between Charles and P.J. Paternal grandparents argued Katheline was not entitled to standing or intervenor status since DCFS had a reasonable belief that P.J.'s

_____

[3]Katheline petitioned to intervene in Peoria County case No. 14-JA-317 under these same statutory provisions. While the record does not indicate the circuit court addressed Katheline's petition to intervene, Katheline was allowed to appear with her attorney at subsequent proceedings.

6

continued placement in Katheline's care jeopardized P.J.'s health or safety. Likewise, paternal grandparents argued Katheline was not entitled to notice of the circuit court proceedings.

¶ 21    On July 7, 2021, Katheline filed a response to paternal grandparents' motion to strike. Katheline suggested DCFS did not follow its own rules for establishing a reasonable belief about P.J.'s placement in her care. Katheline posited, "[i]ncipient and untested notions of a possible risk to a child or the mere fact of a hotline call does not constitute a reasonable belief."

¶ 22                          D. Judgment of the Circuit Court

¶ 23    The circuit court held a hearing on Katheline's petition to intervene on July 20, 2021. The State, P.J.'s guardian *ad litem*, and the attorneys for Jacob, Katheline, and paternal grandparents were present at the hearing. Paternal grandparents' attorney, as well as Jacob's attorney, requested that the circuit court deny or strike Katheline's petition to intervene. However, the State and P.J.'s guardian *ad litem* requested that the circuit court grant Katheline's petition to intervene. Thereafter, the circuit court denied Katheline's petition to intervene, reasoning "[t]his Court looks out for the best interest of the child, and *** I still believe that we reached that conclusion with the appointment of *** [paternal grandparents] as guardians." The circuit court noted Jacob, "who is nearly fit now, *** was in agreement" with the appointment of his parents as guardians. After the hearing, the circuit court entered a formal order that denied Katheline's petition to intervene for the reasons stated on the record and set forth in the responsive pleadings.

¶ 24    Katheline filed a timely notice of appeal on August 18, 2021. Paternal grandparents filed a motion to dismiss this appeal as moot on March 17, 2022, arguing Jacob was found to be fit by agreement of the State and P.J.'s guardian *ad litem*. Katheline objected to the motion to dismiss on March 22, 2022. Our court denied paternal grandparents' motion to dismiss on April 7, 2022.

7

## II. ANALYSIS

On appeal, Katheline challenges the denial of her petition to intervene in the consolidated proceedings under section 1-5(2)(a), (c), and (d) of the Act, which provide as follows:

"§ 1-5. Rights of parties to proceedings.

\* \* \*

(2)(a) Though not appointed guardian or legal custodian or otherwise made a party to the proceeding, any current or previously appointed foster parent \*\*\* has the right to be heard by the court, but does not thereby become a party to the proceeding.

In addition to the foregoing right to be heard by the court, any current foster parent \*\*\* and the agency designated by the court or \*\*\* [DCFS] as custodian of the minor who is alleged to be or has been adjudicated an abused or neglected minor under Section 2-3 \*\*\* of this Act has the right to and shall be given adequate notice at all stages of any hearing or proceeding under this Act.

\* \* \*

(c) If a foster parent has had the minor who is the subject of the proceeding under Article II in his or her home for more than one year \*\*\* and if the minor's placement is being terminated from that foster parent's home, that foster parent shall have standing and intervenor status except in those circumstances where \*\*\* [DCFS] or anyone else authorized under Section 5 of the Abused and Neglected Child Reporting Act has removed the minor from the foster parent because of a reasonable belief that the circumstances or conditions of the minor are such that

continuing in the residence or care of the foster parent will jeopardize the child's health or safety or presents an imminent risk of harm to the minor's life.

(d) The court may grant standing to any foster parent if the court finds that it is in the best interest of the child for the foster parent to have standing and intervenor status." 705 ILCS 405/1-5(2)(a), (c), (d) (West 2020).

The circuit court's denial of a foster parent's petition to intervene under section 1-5(2) is reviewed for an abuse of discretion. See *In re M.W.*, 221 Ill. App. 3d 550, 552 (1991).

¶ 27     In this appeal, Katheline argues she had a statutory right to notice and an opportunity to be heard on the interest of P.J. See 705 ILCS 405/1-5(2)(a) (West 2020). Yet, after P.J.'s removal from her care on February 3, 2021, Katheline states she received neither notice nor an opportunity to be heard on the change in P.J.'s placement and the petition for guardianship.

¶ 28     Further, Katheline argues DCFS could not reasonably believe P.J.'s health and safety were jeopardized or that she faced an imminent risk of harm in Katheline's foster care. See *id.* § 1-5(2)(c). Katheline notes, before the denial of her petition to intervene, the third removal incident was deemed "unfounded" by DCFS. Therefore, absent violations of DCFS's own rules and regulations, relating to the circumstances for the removal of a minor and the notice required to a foster parent, Katheline suggests P.J. would not have been removed from her foster care.

¶ 29     Finally, Katheline argues a grant of her petition to intervene was in P.J.'s best interest. See *id.* § 1-5(2)(d). Katheline states, "there were virtually no factors militating against [her] *** involvement" in decisions impacting P.J. In doing so, Katheline states the concerns over P.J.'s contact with Charles were exaggerated, as shown by the resulting conclusions of "unfounded."

¶ 30    In response, paternal grandparents contend Katheline was not entitled to notice under section 1-5(2)(a) and (c) because she was not a current foster parent.[4] See *id*. § 1-5(2)(a), (c). Also, considering the circuit court's case closure order, dated April 13, 2021, in Peoria County case No. 14-JA-317, paternal grandparents suggest Katheline cannot intervene in a closed case. Further, paternal grandparents argue DCFS had a reasonable belief that P.J.'s health and safety were jeopardized or that she faced an imminent risk of harm in Katheline's care, such that Katheline could be denied intervenor status. See *id*. § 1-5(2)(c). Paternal grandparents remind our court that P.J. was removed from Katheline's care a total of three times due to alleged unsupervised contact between P.J. and Charles. As a result of those removals, paternal grandparents state the circuit court finally provided P.J. permanency through a guardianship.

¶ 31    Here, the record reveals paternal grandparents filed a petition for guardianship, initiating Peoria County case No. 21-P-81, without notice to Katheline. Paternal grandparents also sought and received a consolidation of that case with Peoria County case No. 14-JA-317 without notice to Katheline. After the consolidation, the circuit court, with the consent of Jacob, granted the petition for guardianship. All these proceedings occurred after P.J. was removed from Katheline's foster care on February 3, 2021, but before the May 10, 2021, determination that the third incident was "unfounded." Again, Katheline received no notice of these proceedings, so she could not appear to be heard. Thus, we conclude, at a minimum, Katheline was denied a statutory right to be heard, as a "previously appointed foster parent," in the consolidated proceedings on paternal grandparents' petition for guardianship under section 1-5(2)(a). See § 1-5(2)(a).

¶ 32    Once this omission was realized by the circuit court and the parties, we believe the circuit court should have granted Katheline's petition to intervene, as thought proper by the State and

---

[4] Katheline admitted, "[t]here is no apparent dispute that *** [she] was a former foster parent."

10

P.J.'s guardian *ad litem*. This is especially true where, as was argued by Katheline as a former foster parent, her intervention was in P.J.'s best interest. See *id.* § 1-5(2)(d); 705 ILCS 405/1-3(4.05) (West 2020). P.J. was in Katheline's foster care for roughly six years and Katheline is P.J.'s sibling's adoptive mother. Further, other than the three "unfounded" incidents involving Charles, there is no argument by any party that P.J. did not do well in Katheline's foster care.

¶ 33 We note our conclusions are independent of the "reasonable belief" exception stated in section 1-5(2)(c). See 705 ILCS 405/1-5(2)(c) (West 2020). We also emphasize a grant of Katheline's petition to intervene would not constitute an opinion on the attached motion to vacate paternal grandparents' guardianship. A grant of Katheline's petition to intervene would have merely afforded her the opportunity to be heard, including on the reserved issue of Jacob's fitness and any resultant placement decisions, as required by section 1-5(2)(a) and consistent with section 1-5(2)(d). Contrary to paternal grandparents' position pertaining to the closure of Peoria County case No. 14-JA-317, Katheline could and may now be heard on those issues.

¶ 34 Therefore, we conclude the circuit court abused its discretion by denying Katheline's petition to intervene in the consolidated proceedings. See *In re M.W.*, 221 Ill. App. 3d at 552.

¶ 35 III. CONCLUSION

¶ 36 The judgment of the circuit court of Peoria County is reversed.

¶ 37 Reversed.